******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TOWN OF GREENWICH ET AL. *v.* FREEDOM OF
INFORMATION COMMISSION ET AL.
(AC 46003)
(AC 46064)

Bright, C. J., and Suarez and Clark, Js.

*Syllabus*

The defendants, the Freedom of Information Commission (commission) and
B, appealed to this court from the judgment of the trial court sustaining
the administrative appeal filed by the town plaintiffs from the final
decision of the commission. The commission found that the plaintiffs
violated the Freedom of Information Act (§ 1-200 et seq.) (act) by denying
B's request for records of any changes made to an investigative file for
a reported sexual assault and an associated application for an arrest
warrant because the plaintiffs failed to meet their burden of proving
that the requested records were exempt from disclosure as preliminary
drafts or records of standards, procedures, processes, software and
codes pursuant to statute (§ 1-210 (b) (1) and (20)). The court found that
the commission's decision was clearly erroneous because the requested
records were exempt from disclosure pursuant to § 1-210 (b) (1) as
preliminary drafts. *Held*:

1. The trial court improperly substituted its judgment for that of the commis-
sion by concluding that the requested records were preliminary drafts
that were exempt from disclosure under § 1-210 (b) (1): because it was
undisputed that the plaintiffs failed to conduct a search to determine
whether the records requested by B existed and, to the extent they
existed, to review such records, the plaintiffs could not satisfy their
burden of establishing that those records were exempt from disclosure
as the parties claiming the exemption, and they could not have conducted
the statutorily mandated balancing test, which required that they deter-
mine whether the public interest in withholding such documents clearly
outweighed the public interest in disclosure, as that interest necessarily
depended on the nature of the information contained in the records;
moreover, the commission's order directing the plaintiffs to retrieve the
requested records and to disclose them to B constituted an abuse of
its discretion, and, accordingly, the appropriate remedy in this case was
to have the plaintiffs conduct the search for the requested records and
to review any responsive records to determine whether any material is
exempt from disclosure under the act; furthermore, the commission's
order requiring the plaintiffs to bear the cost of locating and producing
the records, when B had agreed, pursuant to statute (§ 1-212 (b)), to
pay those costs was unwarranted.

2. This court was not persuaded by the plaintiffs' proffered alternative ground
for affirmance, that the requested records were exempt from disclosure

as records of standards, procedures, processes, software and codes under § 1-210 (b) (20): the plaintiffs failed to present any evidence before the commission to substantiate their alleged safety concern involving the specific software or codes that would be revealed by disclosure of the requested records, merely asserting a vague safety concern based on revealing information about the way that the database operated, such that this court could not conclude that the plaintiffs satisfied their burden of proving that the requested records were exempt from disclosure under § 1-210 (b) (20); moreover, in accordance with the act, the plaintiffs were free to develop their own method of retrieving and producing the requested records, and, thus, could avoid their concerns about potential disclosures regarding their software or codes.

Argued February 5—officially released June 11, 2024

*Procedural History*

Administrative appeal from the decision of the named defendant, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the judicial district of New Britain where the matter was tried to the court, *Cordani, J.*; judgment sustaining the appeal, from which the defendants appealed to this court. *Reversed*; *judgment directed*.

*Meredith Braxton*, self-represented, with whom was *Mark Sommaruga*, for the appellant in Docket No. 46003 (defendant Meredith Braxton).

*Valicia Harmon*, commission counsel, with whom, on the brief, were *Paula S. Pearlman*, associate general counsel, *Colleen M. Murphy*, general counsel, and *C. Zack Hyde*, commission counsel, for the appellant in Docket No. 46064 (named defendant).

*Abby R. Wadler*, assistant town attorney, for the appellees in both appeals (plaintiffs).

*Opinion*

BRIGHT, C. J. The defendants, the Freedom of Information Commission (commission) and Attorney Meredith Braxton, appeal from the judgment of the trial court sustaining the administrative appeal filed by the

plaintiffs, the Chief of Police of the Greenwich Police Department, the Greenwich Police Department (department), and the town of Greenwich (town), from the final decision of the commission. The commission found that the plaintiffs violated the Freedom of Information Act (act), General Statutes § 1-200 et seq., by denying Braxton's request for records of any changes made to an investigative file and an associated application for an arrest warrant because the plaintiffs failed to meet their burden of proving that the requested records are exempt from disclosure pursuant to General Statutes § 1-210 (b) (1) and (20). The trial court concluded that the records are exempt as preliminary drafts under § 1-210 (b) (1) and sustained the plaintiffs' appeal on that basis. On appeal, the defendants claim that the court improperly substituted its judgment for that of the commission by concluding that the requested records are preliminary drafts that are exempt from disclosure under § 1-210 (b) (1). We agree with the defendants. We also are not persuaded by the plaintiffs' proffered alternative ground for affirmance, namely, that the requested records are exempt from disclosure under § 1-210 (b) (20). Accordingly, we reverse the judgment of the trial court.

The following facts, either as found by the commission's hearing officer or undisputed in the record, and procedural history are relevant to the parties' claims. "[B]y letter dated May 22, 2020, [Braxton], on behalf of her client Brian Scanlan, requested a copy of: '[d]ocuments and/or database information reflecting all changes made (i.e., text inserted, changed or deleted from the file) to the investigation file of CFS No. 1600027332 (the investigation file for the complaint by Doe against Roe) and of all changes made to the application for an arrest warrant in that case.' . . . [W]ith [that letter], [Braxton] provided the [plaintiffs] with a set of database commands and suggested [that] the

[plaintiffs] use such commands to retrieve the requested records. [Braxton] also informed the [plaintiffs] that she would pay the cost of retrieval by a qualified technician, if necessary. . . .

"[B]y letter dated June 16, 2020, the [plaintiffs] informed [Braxton] that they did not 'have any information reflecting any changes that could have been made.' In addition, the [plaintiffs] informed [Braxton] that 'NexGen [Public Safety Solutions, the software vendor responsible for developing and maintaining the department's databases (NexGen)] has informed the [department] that they cannot produce any prior versions.' . . . [B]y letter dated June 19, 2020, [Braxton] clarified for the [plaintiffs] that she was not seeking 'different versions' of the investigative file and the arrest warrant applications; but rather, was seeking 'database information that reflects changes made to those files in the NextGen system.' "

By letter dated June 23, 2020, the town again stated "that NexGen has informed [the department] that it cannot produce previous versions of reports once they are finalized. Any requested changes, should they exist, would essentially identify a previous version. In addition, [§] 1-210 (b) (1) of the [act] exempts preliminary drafts from mandatory disclosure. Your request is essentially seeking preliminary drafts."

On July 7, 2020, Braxton filed an appeal with the commission, stating, in relevant part: "I represent the plaintiff in the case of *Doe* v. *Greenwich*, currently pending in [the] United States District Court for the District of Connecticut. This litigation involves a sexual assault reported to the [department] by the plaintiff. The sexual assault was investigated by the [department], but ultimately no arrest was made and no prosecution of the perpetrator was commenced.

* * *

"On May 22, [2020], I requested documents and/or database information reflecting all changes made to the NextGen file by the [department] in its investigation of the sexual assault reported by the plaintiff, and all changes made to any application for an arrest warrant in that investigation. At the same time, I supplied the method to retrieve such changes from the NexGen database in the form of database commands. . . .

* * *

"With respect to the NexGen request, [the town] reiterated its belief that it is unable to comply with my request, despite the fact that I provided them with the database code search parameters directly from NexGen itself. [The town] now also argues that my request is for 'preliminary drafts' exempted from mandatory disclosure under . . . § 1-210 (b) (1). My request was not for any preliminary draft, rather for the database information that reflects changes made to those files in the NexGen system.

"Moreover, even if my request had been for a preliminary draft, [the town] has not demonstrated that the public interest in withholding that information clearly outweighs the public interest in its disclosure. . . . [The town] has remained silent on this issue, seemingly defaulting to the idea that all preliminary drafts are exempt from disclosure, without regard to showing that the public interest favors either withholding or disclosure." (Citation omitted.)

"At the contested case hearing held on August 2, 2021, the [plaintiffs] claimed that they do not maintain any 'prior versions' of the investigative report or arrest warrant application, or any other record that would show any edits made to such records. [Braxton] claimed

that such records are, in fact, maintained in the [department's] database, and at the November 4, 2021 contested case hearing, offered the testimony and affidavit of Lee Wezenski, Chief Development Officer for Nex-Gen . . . in support of her claim. . . .

"[T]he electronic records management system and software used by the [plaintiffs] is provided by NexGen. . . . [P]olice incident reports and arrest warrant applications, among other records, are created, revised and maintained in such database. . . . [R]eports and other documents may be edited or revised in the database up until the time they are reviewed and approved by the commanding officer. . . . NexGen has access to all of the . . . department's computer servers and all of the information located on such servers. . . .

"Wezenski wrote the database commands, referenced . . . above, and provided such commands to . . . Scanlan, in response to a subpoena. . . . [T]hese database commands are the same commands that [Braxton] provided to the department with the records request at issue herein . . . . [E]xecution of the database commands would produce a 'rich text format' (RTF) file reflecting additions or deletions to the text of a record maintained in the [department's] database, and the time and date such changes were made. . . . [I]f the [plaintiffs] so requested . . . Wezenski could, and would, execute the database commands for the [plaintiffs] so that such file could be produced. . . .

"[P]rior to receiving the database commands from . . . Scanlan, the [plaintiffs] had no knowledge of such commands, were unaware that such commands could be used to produce the file . . . and did not have a staff member trained to execute such commands. . . . [A]t least by August 2, 2021 (the date of the initial hearing in this matter), the [plaintiffs] had information, in the form of . . . Wezenski's affidavit, dated June 9,

2021, that a file showing additions and deletions to the report and arrest warrant application, to the extent those records had been edited, would be maintained in the database and accessible by running the database commands . . . .

"[D]espite having such information, the [plaintiffs] had not, as of the date of the initial or continued hearing in this matter, requested that NexGen execute the database commands in order to determine whether . . . there is a record or records in the database that would be responsive to [Braxton's] request . . . .

"Rather, without having made an attempt to retrieve and review any potentially responsive record or records, at the hearing in this matter, and in their posthearing brief, the [plaintiffs] claimed that the requested records are exempt from disclosure pursuant to [§] 1-210 (b) (1) . . . and (20) . . . .

"With respect to § 1-210 (b) (1) . . . such provision states that disclosure is not required of 'preliminary drafts or notes provided the public agency has determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure.' . . . [T]he [plaintiffs] did not review any potentially responsive records prior to the hearing in this matter, and it is therefore further found that the testimony offered at the hearing was not specific to any particular record. Although the assistant police chief testified that it would violate an unspecified policy of the department to execute the database commands . . . the assistant police chief did not testify that he had determined that the public interest in withholding the record clearly outweighed the public interest in disclosure. Accordingly, [the hearing officer] found that the [plaintiffs] failed to prove that the requested records, if they exist, are exempt from disclosure pursuant to § 1-210 (b) (1) . . . ."

The hearing officer concluded that § 1-210 (b) (20) did not apply "because the requested records are not 'standards, procedures, processes, software or codes' but rather, are records that may be produced upon execution of certain database commands . . . ." Accordingly, the hearing officer found that the plaintiffs violated the act and ordered that, "[w]ithin fourteen days of the date of the notice of final decision, the [plaintiffs] shall provide a copy of the records . . . to [Braxton], free of charge." The commission adopted the hearing officer's report in a final decision, and the plaintiffs filed an administrative appeal in the Superior Court pursuant to General Statutes § 4-183.

In their brief in support of their administrative appeal, the plaintiffs argued that "requiring the plaintiffs to run data commands on the [department's] computer system in order to elicit 'text inserted, changed or deleted' from a certain file, violates [§] 1-210 (b) (1) and (20). In addition, the commission . . . arbitrarily ignored evidence presented at [the] hearing[s] that (1) the records being sought were, in fact, preliminary drafts, (2) that the plaintiffs made a good faith determination that withholding the records outweighed the public interest in disclosure, (3) that . . . Braxton's request to run the computer [database] commands or codes . . . would create a record of software and codes which are not otherwise available to the public and would compromise the security of the plaintiffs' information technology system, and (4) that the commission incorrectly considered novel information presented at the hearing and discounted the contradictory information available at the time of . . . Braxton's request." The defendants filed separate briefs in support of the commission's final decision. In its brief, the commission argued that, because "the plaintiffs cannot definitively claim to know the nature of any potentially responsive records" without first reviewing those records, their failure to

run the database commands in order to review any potentially responsive records precluded their claims that the requested records are preliminary drafts and that the plaintiffs had performed the balancing test required under § 1-210 (b) (1). The commission also argued that it "properly found that the requested records are not 'standards, procedures, processes, software or codes' [within the meaning of § 1-210 (b) (20)] . . . ." In her brief, Braxton made substantially similar arguments to those made by the commission, but she also contended that "[s]ubstantial evidence supports the conclusion that the records are not preliminary drafts or notes." Braxton, however, acknowledged that "[t]he hearing officer did not explicitly rule on whether . . . the records sought were 'preliminary drafts or notes' [within the meaning of § 1-210 (b) (1)]."

The trial court issued a memorandum of decision sustaining the plaintiffs' administrative appeal. The court agreed in part with the plaintiffs, concluding that the commission's decision was clearly erroneous because the requested records are exempt from disclosure pursuant to § 1-210 (b) (1), but it rejected their claim that the requested records are exempt pursuant to § 1-210 (b) (20). As to the application of § 1-210 (b) (1), the court reasoned that "a review of the records produced by executing the database commands was not necessary to determine whether any responsive documents produced were preliminary drafts because the request itself specifically and solely sought preliminary drafts by [its] very terms." The court noted that "[w]hether the changes, insertions and deletions are provided in red-line form or merely in notation or list form, the possession of the changes, insertions and deletions along with the final document is the possession of preliminary drafts of the documents." (Internal quotation marks omitted.) "Accordingly, either the records produced would be nonresponsive to the request or they would be responsive preliminary drafts.

"To the extent that executing the database commands produced responsive preliminary drafts, it was also not necessary to review these documents to discern certain basic attributes of the documents. . . . [T]he request sought preliminary drafts of police reports, warrants, and warrant applications relating to a specific alleged sexual assault. . . . [B]asic assessments concerning whether the public interest in withholding the documents outweighs the public interest in disclosure can be made without reviewing the specific documents. . . . In view of the importance of these documents, it is not surprising that procedures for [their] creation, review, authorization and finalization . . . are in place to ensure that the official final documents are accurate, well considered, and consistent with our law. . . . [U]ndermining [those] procedures . . . by releasing preliminary drafts of these documents to the public poses a real risk of undermining police operations, investigations, prosecutions, and the faith and confidence in our legal system. Preliminary drafts of these documents are nonfunctional and have not been considered and reviewed as is required by the normal review and authorization process. Accordingly, they may contain mistakes, poor judgment, and investigatory and prosecutorial thought processes that have not been finalized, any of which may unnecessarily negatively impact the rights of defendants, victims, and the state . . . . [Exposing] [s]uch preliminary mistakes, poor judgment, and . . . investigatory and prosecutorial thoughts, all of which would have been properly corrected and refined through the applicable procedures, run the risk of unfairly and unnecessarily undermining confidence in the police and the justice system.

"Officer [Gene] Chan and Deputy Chief [of Police] [Robert] Berry [of the department] generally testified as to the foregoing concerns, and Deputy Chief Berry testified that the . . . department determined that

releasing such preliminary drafts was not in the public's best interest. Officer Chan testified that the police department had a process for reviewing reports and warrants before they were authorized and finalized, that producing previous versions of police reports and warrants endangered the integrity of the reports and warrants, and that it was important that each document be 'locked' in final form after the writing, authorization and review process was complete.[1] . . . Officer Chan also testified concerning the importance of only having one . . . official signed off version of each report or warrant.[2] . . . Deputy Chief Berry testified concerning the process of finalizing reports and warrants, the importance of the review process, and the importance

[1] Officer Chan testified that "[t]he term is actually not locking, it's signing off on a report which your direct supervisor does, and a [commanding officer will] review it. In terms of locking a report, that means if the report is sensitive, you lock the report so no one else can access or look at the report. So it's really signing off [on] the report and the commander reviewing the report. . . . So, the first step is it's signed off [on] and it goes to a higher supervisor, meaning a captain or above. They will [command] review. Once it's command reviewed, it will [block] the tab to change [the document] in any way, shape or form. . . . I believe—well, there's another step in the process so—if [I] could backtrack. So, the officer will complete the report, whether it's a motor vehicle accident or [some other] report. He will . . . sign off on it. The direct supervisor will then sign off on it, [but] it's [a] PDF, meaning they electronically sign it. So then the direct supervisor signs off on it, then it gets pushed forward to the commanding officer. . . . [After the commanding officer reviews it], [t]hat incident, the call for servicing, called the CFS, it becomes locked. That report becomes locked. Not locked, it—there's different terms for it. It becomes [that] it cannot be changed, that report itself. . . . The official report is the command reviewed report on file." During Braxton's cross-examination of Officer Chan, however, he acknowledged that a supervisor could "unsign" a report in NexGen for someone to make changes to the report.

[2] When asked "what would be the danger in [changes to reports] becoming public," Officer Chan testified that "the integrity of the report would be in question. Once it's signed off, the whole purpose of it is . . . similar to chain of custody of evidence, once it's signed off and given to court, that is the final version. And we can't have different versions floating around in public or different versions even in court. So that's the whole purpose of commander review and signing off on a report."

of only maintaining the final official documents.[3] . . . Deputy Chief Berry also testified that he was concerned that running nonstandard, previously unknown database commands might endanger the integrity or security of the database and its records. . . . Finally, Deputy Chief Berry testified that attempting to run the nonstandard, previously unknown database commands to produce unauthorized previous versions of police reports and warrants was not 'in the best interest of the public.'[4] . . .

---

[3] During direct examination, Deputy Chief Berry testified that "[w]hat we maintain are the PDF, the permanent data files that are created once the officer completes their report. An officer prepares the report, they sign off on it, a supervisor then reviews it, signs off on it, and there's a command review, and that is the record that is maintained. . . . When this initially came up, we queried NexGen about the prospect of doing this. We were told that it's not possible, we are not allowed to do it, and there would be legal ramifications. But just in the interest of trying to find out what is possible, you know, we checked."

[4] Deputy Chief Berry testified generally about the public interest in accessing prior versions of department records during the following exchange with the plaintiffs' counsel:

"Q. You've heard some discussion about the public interest in accessing these prior versions. Did you consider that in weighing the request?

"A. I wouldn't say in the terms of the exact discussion of public interest but we had a discussion—I think the analogous or—you know, it's comparative to releasing a typewriter ribbon from a typewriter as officers prepared reports thirty or forty years ago, you know, there's different versions, an officer might have a spelling mistake or going to change it back. Calling those deletions I think is a very—it's not a good way to display what this really is talking about. As even the NexGen representative said, these are not documents we're talking about. They just—they're keystrokes. It's data. And again, I think that comparison to a typewriter ribbon is probably apropos.

"Q. And what is the concern about that becoming a public document?

"A. Well, I have several concerns and actually more as I sat here today listening to it. We do have and we did [an] investigation into this matter, we do believe that there has been a breach of our data, which . . . goes to why we're very interested and concerned about this.

"Q. Do you know what would [happen] if for some reason you were able to enter the keystrokes which were given to you. Do you know what would happen?

"A. Absolutely not. I heard testimony today about what it would do, but we do [not] have the expertise. We don't have the knowledge, we've never

"Accordingly, it is clear that any responsive documents produced by executing the database commands would be preliminary drafts of police reports, warrants, and warrant applications associated with a particular alleged sexual assault investigation. It is also clear that the two police witnesses testified concerning real concerns about releasing preliminary drafts of the foregoing documents. Lastly, it is clear that the deputy chief testified that he had determined that releasing such unauthorized preliminary drafts was not in the best interest of the public or, said another way, that the public's interest in withholding these preliminary drafts outweighed the public interest in disclosure. . . .

"[Section] 1-210 (b) (1) is absolutely clear that it is the province of the public agency, not the [commission], to make this determination. . . . See *Van Norstrand* v. *Freedom of Information Commission*, 211 Conn. 339, 345, 559 A.2d 200 (1989). Deputy Chief Berry was also clear in testifying that the . . . department had made this determination: 'And I guess that our statement on that is that we don't think it would be in the best interest of the public.' . . . Determining that releasing preliminary drafts is not in the best interest of the public is the same as determining that the public's interest in withholding them outweighs the public's interest in disclosure. Both Deputy Chief Berry and Officer Chan testified concerning the reasons for their determination, which were, as noted above, not surprising and reasonable. The agency's determination of the public interest in this regard is reviewed on an abuse of discretion standard, which standard is certainly not met here. . . .

"Overlaid on all of the foregoing, one must give consideration to the requirement that the . . . department

done this before. This is not something that we do. And again, the information that we've had from NexGen [is that] once the file is PDF, that's the record. That's the official record we have."

run nonstandard, noncommercial, previously unknown database commands on its database. It must be noted that these commands were received from an individual, albeit the Chief Development Officer of NexGen, as a result of a subpoena. It is apparent that these commands are nonstandard, in that they are not provided to NexGen's customers in the ordinary course of business. It is also apparent that the . . . department had not previously received these commands in connection with its database and that, before [Braxton's] request was received, the . . . department was unaware of the existence of the commands and of the very fact that the database retained preliminary drafts of documents. Accordingly, it was not unreasonable for Deputy Chief Berry to have legitimate concerns about running these commands. He clearly testified that the . . . department was concerned that running the commands, something it had never done before, might have unknown impacts on the security and integrity of the database and the information contained therein. . . . These commands came only with the assurance of a single individual as to their appropriateness, function and safety in relation to the system. Accordingly, it is not surprising and not unreasonable that the police department was hesitant to run such commands. The court does not believe that a public agency is required to put its computer system at risk by running nonstandard, noncommercial, previously unknown and never before run commands which have been provided by an individual in order to satisfy the agency's . . . search obligation." (Citations omitted; emphasis omitted; footnotes added; footnotes omitted.)

As to § 1-210 (b) (20), the court reasoned that "[t]he requested records are not records of standards, procedures, processes, software and codes. . . . [Braxton did not seek] disclosure of the database commands. . . . [T]he database commands were supplied pursuant

[to] a subpoena in a proceeding that was separate from this administrative proceeding. The mere use of those commands by the . . . department would not potentially implicate the exemption in § 1-210 (b) (20) unless the records which were produced were records of standards, procedures, processes, software and codes. Such is clearly not the case here." Accordingly, the court sustained the plaintiffs' administrative appeal, and these appeals followed.[5]

As a preliminary matter, we note "the limited scope of judicial review afforded by the Uniform Administrative Procedure Act; General Statutes § 4-166 et seq.; to the determinations made by an administrative agency. [W]e must decide, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. . . . Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the [administrative agency]." (Citation omitted; internal quotation marks omitted.) *Aronow* v. *Freedom of Information Commission,* 189 Conn. App. 842, 858, 209 A.3d 695, cert. denied, 332 Conn. 910, 210 A.3d 566 (2019).

I

On appeal, the defendants claim that the court improperly substituted its judgment for that of the commission in concluding that the requested records are

---

[5] Braxton filed her appeal in this court on November 14, 2022, which was assigned docket number AC 46003, and, on December 5, 2022, the commission filed its appeal, which was assigned docket number AC 46064.

preliminary drafts that are exempt from disclosure under § 1-210 (b) (1). Specifically, the defendants claim that the court improperly concluded that it was not necessary for the plaintiffs to review the requested records to determine, first, that those records are preliminary drafts and, second, that the public interest in withholding the records outweighed the public interest in disclosure pursuant to § 1-210 (b) (1). We will address each subclaim in turn.

The relevant legal principles regarding the preliminary drafts or notes exemption under the act are well settled. Section 1-210 (b) (1) provides: "Nothing in the Freedom of Information Act shall be construed to require disclosure of . . . Preliminary drafts or notes provided the public agency has determined that the public interest in withholding such documents clearly outweighs the public interest in disclosure . . . ."

Accordingly, "a party claiming that records are exempt from disclosure under § 1-210 (b) (1) must prove, first, that the records are preliminary drafts or notes and, second, that the public interest in withholding the documents clearly outweighs the public interest in disclosure. . . .

"With respect to § 1-210 (b) (1), *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 332–33, 435 A.2d 353 (1980), defined preliminary drafts in a manner that our courts subsequently have uniformly applied. [T]he term preliminary drafts or notes relates to advisory opinions, recommendations and deliberations comprising part of the process by which government decisions and policies are formulated. . . . Such notes are predecisional. They do not in and of themselves affect agency policy, structure or function. They do not require particular conduct or forbearance on the part

After both appeals were ready for argument, Braxton filed a motion to consolidate the two appeals, which this court denied.

of the public. Instead, preliminary drafts or notes reflect that aspect of the agency's function that precedes formal and informed [decision-making]. . . .

"Preliminary is defined as something that precedes or is introductory or preparatory. As an adjective it describes something that is preceding the main discourse or business. A draft is defined as a preliminary outline of a plan, document or drawing . . . . By using the nearly synonymous words preliminary and draft, the legislation makes it very evident that preparatory materials are not required to be disclosed. . . .

"[T]he concept of preliminary [within the meaning of § 1-210 (b) (1)], as opposed to final, should [not] depend upon . . . whether the actual documents are subject to further alteration. . . . [P]reliminary drafts or notes reflect that aspect of the agency's function that precedes formal and informed [decision-making]. . . . It is records of this preliminary, deliberative and predecisional process that we conclude the exemption was meant to encompass." (Citations omitted; internal quotation marks omitted.) *Lindquist* v. *Freedom of Information Commission*, 203 Conn. App. 512, 526–27, 248 A.3d 711 (2021).

The statute, however, does not provide a categorical exemption for all preliminary drafts or notes, as the public agency claiming the exemption must determine "that the public interest in withholding such documents clearly outweighs the public interest in disclosure . . . ." General Statutes § 1-210 (b) (1). "Although the statute places the responsibility for making that determination on the public agency involved, the statute's language strongly suggests that the agency may not abuse its discretion in making the decision to withhold disclosure. The agency must, therefore, indicate the reasons for its determination to withhold disclosure and those reasons must not be frivolous or patently

unfounded." (Internal quotation marks omitted.) *Van Norstrand* v. *Freedom of Information Commission*, supra, 211 Conn. 345.

In applying the exemptions set forth in the act, we are mindful "that the general rule under the [act] is disclosure, and any exception to that rule will be narrowly construed in light of the general policy of openness expressed in the [act]. . . . [Thus] [t]he burden of proving the applicability of an exception [to disclosure under the act] rests upon the party claiming it." (Internal quotation marks omitted.) *Lindquist* v. *Freedom of Information Commission*, supra, 203 Conn. App. 525–26.

Because the defendants' claim involves the application of the well settled meaning of the preliminary drafts exemption to the underlying facts, "[t]he appropriate standard of judicial review . . . is whether the commission's factual determinations are reasonably supported by substantial evidence in the record taken as a whole." (Internal quotation marks omitted.) *Director, Dept. of Information Technology* v. *Freedom of Information Commission*, 274 Conn. 179, 187, 874 A.2d 785 (2005).

The defendants first claim that the court improperly determined that it was not necessary to review the requested records for the plaintiffs to conclude that those records are preliminary drafts or notes within the meaning of § 1-210 (b) (1). Braxton argues that "the case reports and arrest warrant application in this case are not part of a 'deliberative and predecisional process.' The plaintiffs presented no testimony at all indicating any discussion occurred or recommendations [were] made concerning the material recorded or that [the department] engaged in a 'free and candid exchange of ideas.' " The commission argues that,

because "it is undisputed that the plaintiffs never determined whether the requested records exist, never reviewed the requested records, and never provided any testimony specific to the requested records or the process for finalizing the actual reports related to such records," "there is no evidence establishing that changes to such requested records were only made prior to the finalized report(s)." Both defendants also claim that the plaintiffs could not conduct the mandated public interest balancing test without first reviewing the records.

In response, the plaintiffs contend that, "[b]ecause of the nature of the request—insertions and deletions— it is not necessary to review the prior documents, if any, to know that they constitute preliminary drafts." They argue that "the final police report is the decisional document. The insertions and deletions made to it in the drafting process are predecisional, and the decisions made after the police report is finalized into the operative version, are postdecisional. Officer Chan's testimony outlined the process of command reviewing the documents before the police report is locked, at which time the report is final . . . ." In its reply brief, the commission maintains that the generalized testimony as to the process typically followed by the department was insufficient to establish "that such processes and procedures were actually followed here." We agree with the commission and conclude that, without first conducting a search to determine whether the records requested by Braxton exist and, to the extent they exist, reviewing such records, the plaintiffs cannot satisfy their burden of establishing that those records are exempt from disclosure pursuant to § 1-210 (b) (1).

Our Supreme Court has recognized that, "[w]here the nature of the documents, and, hence, the applicability of an exemption, is in dispute it is not only within the

commission's power to examine the documents themselves, it is contemplated by the act that the commission do so. . . . [T]he commission [has] a central role in resolving disputes administratively under the act. To fulfill this role effectively, the commission's determinations must be informed. It should not accept an agency's generalized and unsupported allegations relating to documents claimed to be exempt from disclosure. . . . Unless the character of the documents in question is conceded by the parties, an in camera inspection of the particular documents by the commission may be essential to the proper resolution of a dispute under the act. Where such an inspection would be burdensome on the commission . . . or ineffective because of the absence of the adversarial process . . . other methods for ascertaining the character of the documents may be employed by the parties and the commission. The agency representative may testify concerning the content and use of the documents, or supply affidavits to the commission relating to their content and use. Any such testimony or affidavits must not be couched in conclusory language or generalized allegations, however, but should be sufficiently detailed, without compromising the asserted right to confidentiality, to present the commission with an informed factual basis for its decision in review under the act. . . . No matter what method is utilized before the commission, however, one thing is clear: It is the agency that bears the burden of proving the applicability of an exemption . . . ." (Citations omitted; internal quotation marks omitted.) *Wilson* v. *Freedom of Information Commission*, supra, 181 Conn. 339–41.

In *Wilson*, our Supreme Court explained that it was not necessary for the commission to examine the requested records "because the record disclose[d] that [the head of the agency] testified before the commission concerning their contents in sufficient detail and neither

the commission nor [the requester] question[ed] the advisory and predecisional nature of those documents." Id., 341. In the present case, however, the plaintiffs never entered the database commands to search for responsive records and, therefore, could not offer any detailed testimony about the contents of any responsive records. Thus, although we recognize that the terms of the request itself suggest that the requested records are preliminary drafts or notes, as Braxton sought changes, insertions and deletions to the file and arrest warrant application, in concluding that the requested records *necessarily* are preliminary drafts or notes, the trial court relied on the plaintiffs' "conclusory language [and] generalized allegations" about the nature of records that the plaintiffs neither accessed nor reviewed. Id.

The court reasoned that "there are only two possibilities. The documents in question may never have been changed at all, in which case there would be no 'changes made to (i.e., text inserted, changed or deleted from the file)' to be produced as responsive to [Braxton's] request. In the alternative, changes were made to the documents and these changes comprised preliminary drafts that are protected from disclosure pursuant to § 1-210 (b) (1)." There is, however, a third possibility, because, although Officer Chan testified that "[t]he official report is the command reviewed report on file," he also testified that a supervisor could "unsign" a report in NexGen for someone to make changes to the report. Because the plaintiffs did not run the database commands to determine whether any responsive records exist, much less review the contents of any such records, they do no not know if, when, or by whom any changes to any such records were made and, thus, whether the requested records are a part of a "preliminary, deliberative and predecisional process . . . ."

(Internal quotation marks omitted.) *Lindquist* v. *Freedom of Information Commission*, supra, 203 Conn. App. 527. It follows, therefore, that there could be responsive records that are not part of the predecisional process but, rather, are part of a "postdecisional" process. Thus, the plaintiffs' presentation of testimony about the general process for finalizing reports was insufficient to establish that the proper process was followed as to the requested records. See *New Haven* v. *Freedom of Information Commission*, 4 Conn. App. 216, 220–21, 493 A.2d 283 (1985) ("The plaintiffs failed to submit the requested records before the [commission] for review and it is their burden to prove the applicability of the exemption. . . . Mere speculative and conclusory statements as to the impact of disclosure do not satisfy the plaintiff's burden of establishing an adequate record to show why the records are exempt." (Citations omitted.)).

As the parties claiming the exemption, it was the plaintiffs' burden to "provide more than general or conclusory statements in support of [their] contention." *Director, Dept. of Information Technology* v. *Freedom of Information Commission*, supra, 274 Conn. 194. In the absence of "an informed factual basis for [the plaintiffs'] decision"; *Wilson* v. *Freedom of Information Commission*, supra, 181 Conn. 341; we conclude that the commission properly refused to "accept [the plaintiffs'] generalized and unsupported allegations relating to documents claimed to be exempt from disclosure." Id., 340.

Moreover, assuming arguendo that the requested records exist and are preliminary drafts, the plaintiff's failure to review the records also is fatal to their assertion that they conducted the required balancing test under § 1-210 (b) (1). Both defendants rely on our Supreme Court's decision in *Shew* v. *Freedom of Information Commission*, 245 Conn. 149, 151, 714 A.2d 664

(1998), in which the commission ordered the town manager of the town of Rocky Hill (Rocky Hill) "to provide the defendant, Edward A. Peruta, with access to certain interview reports created by [an] attorney . . . who had been hired by [Rocky Hill] to [investigate] its police chief, Philip Schnabel." (Footnote omitted.)

In *Shew*, the trial court sustained the town manager's appeal from the commission's order requiring disclosure of the documents, finding "that the commission's conclusion that the documents in question were not preliminary drafts or notes within the meaning of [the exemption] was improper. The trial court remanded the case to the commission to make findings . . . as to whether the town manager properly determined that the public interest in withholding the documents outweighed the public interest in their disclosure." (Internal quotation marks omitted.) Id., 155. This court affirmed the judgment of the trial court, and our Supreme Court granted the commission's petition for certification to appeal. Id., 151. In that certified appeal, the commission claimed, in relevant part, that this court improperly determined that the documents were preliminary drafts within the meaning of the predecessor to § 1-210 (b) (1). Id., 163. Our Supreme Court disagreed, concluding that the records at issue were preliminary drafts within the meaning of the statute. Id., 165. Notwithstanding that conclusion, the court held that "the case must be remanded for a determination by the town as to whether the public interest in withholding such documents clearly outweighs the public interest in disclosure . . . . It is undisputed that the town manager never reviewed the documents; *consequently, he could not have conducted the balancing test mandated by the statute.*" (Citation omitted; emphasis added; footnote omitted; internal quotation marks omitted.) Id., 167.

In the present case, just as in *Shew*, there is no dispute that the department never reviewed any responsive

records. As a result, the plaintiffs could not have conducted the statutorily mandated balancing test, which requires that they determine whether the public interest in withholding such documents clearly outweighs the public interest in disclosure. It is axiomatic that the plaintiffs must know what is in the records in order to determine the public interest in disclosure, as that interest necessarily depends on the nature of the information contained in the records. The plaintiffs' arguments to the contrary are unavailing.

First, the plaintiffs argue that the trial court properly "found, based on the evidence presented to the commission, that Officer Chan and Deputy Chief Berry reasonably determined that they did not need to run the [database commands] in order to conclude that the public interest in preserving the integrity of the police reports and in adhering to established protocols for data quality control outweighed the public interest in disclosure." The trial court, however, cannot simply substitute its judgment for that of the commission, which reasonably refused to accept the plaintiffs' "generalized and unsupported allegations relating to documents claimed to be exempt from disclosure." *Wilson* v. *Freedom of Information Commission*, supra, 181 Conn. 340. Moreover, by accepting the plaintiffs' invocation of general concerns to support its determination that it was unnecessary to review the requested records, the court effectively expanded the limited exception to disclosure set forth in § 1-210 (b) (1) into a broad categorical exemption for all preliminary drafts or notes, regardless of any public interest in the disclosure of a specific document. Not only does such reasoning contradict our Supreme Court's holding in *Shew*, but it also undermines the overarching "legislative policy of the [act] favoring the open conduct of government and free public access to government records," which policy requires that we "construe the provisions of the [act]

to favor disclosure and to read narrowly that act's exceptions to disclosure." (Internal quotation marks omitted.) *Commissioner of Energy Services & Public Protection* v. *Freedom of Information Commission,* 330 Conn. 372, 383, 194 A.3d 759 (2018). Mindful of that policy and consistent with our Supreme Court's decision in *Shew* v. *Freedom of Information Commission,* supra, 245 Conn. 167, we conclude that § 1-210 (b) (1) requires an agency to conduct the public interest balancing test on a case-by-case basis *after* having reviewed the requested records. Put simply, we are not persuaded that the department's generalized interest in preserving the integrity of law enforcement records, as opposed to some particularized interest unique to a specific record, will in every instance clearly outweigh the public interest in disclosure.

Second, the plaintiffs argue that the request at issue in the present case is fundamentally different from the request in *Shew* because the request in *Shew* did not require that Rocky Hill "run a noncommercially available and untested computer program through [its] computer system to produce the documents." According to the plaintiffs, "[t]he commission erroneously decided that the plaintiffs would need to run the [database commands in] order to make a determination regarding the public interest" because "there is no court precedent that obligates a public agency to run unlicensed software provided by an individual to comply with a freedom of information request." We are not persuaded.

Contrary to the plaintiffs' assertion, our Supreme Court has held that the act requires an agency to conduct the type of search requested by Braxton. Braxton requested information stored on the department's computer database, provided the department with the database commands that the department needed to retrieve the requested records, and, in accordance with General

Statutes § 1-212 (b),[6] agreed to pay the costs associated with the request. Accordingly, her request is governed by General Statutes § 1-211 (a), which provides that "[a]ny public agency which maintains public records in a computer storage system shall provide, to any person making a request pursuant to the Freedom of Information Act, a copy of any nonexempt data contained in such records, properly identified, on paper, disk, tape or any other electronic storage device or medium requested by the person, including an electronic copy sent to the electronic mail address of the person making such request, if the agency can reasonably make any such copy or have any such copy made. Except as otherwise provided by state statute, the cost for providing a copy of such data shall be in accordance with the provisions of section 1-212."

Our Supreme Court previously has construed § 1-211 (a) in *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 801 A.2d 759 (2002). In that case, the court reasoned that "[t]he flexibility and

[6] General Statutes § 1-212 (b) provides in relevant part: "The fee for any copy provided in accordance with subsection (a) of section 1-211 shall not exceed the cost thereof to the public agency. In determining such costs for a copy . . . an agency may include only: (1) An amount equal to the hourly salary attributed to all agency employees engaged in providing the requested computer-stored public record, including their time performing the formatting or programming functions necessary to provide the copy as requested, but not including search or retrieval costs except as provided in subdivision (4) of this subsection; (2) An amount equal to the cost to the agency of engaging an outside professional electronic copying service to provide such copying services, if such service is necessary to provide the copying as requested; (3) The actual cost of the storage devices or media provided to the person making the request in complying with such request; and (4) The computer time charges incurred by the agency in providing the requested computer-stored public record where another agency or contractor provides the agency with computer storage and retrieval services. . . . The Department of Administrative Services shall provide guidelines to agencies regarding the calculation of the fees charged for copies of computer-stored public records to ensure that such fees are reasonable and consistent among agencies."

breadth of this statute is . . . illustrated by the language providing that a copy of such data shall be provided 'on paper, disk, tape or any other electronic storage device or medium requested by the person . . . .' " Id., 93. "There is no indication in the language of § 1-211 that the scope of that statute is restricted to document formats currently in existence. Indeed, such a conclusion is belied by the fee provisions contained in § 1-212 (b), which permits an agency to include in its fee for a request pursuant to § 1-211 (a) '[a]n amount equal to the hourly salary attributed to all agency employees engaged in providing the requested computer-stored public record, *including their time performing the formatting or programming functions necessary to provide the copy as requested*' . . . or '[a]n amount equal to the cost to the agency of engaging an outside professional electronic copying service to provide such copying services, if such service is necessary to provide the copying as requested. . . .' " Id. "Section 1-212 (b) contemplates that an agency may be required to perform formatting or programming functions, or that the agency may contract with an outside entity to perform such functions, in order to comply with requests pursuant to the act.

\* \* \*

"It is thus clear that the legislature envisioned . . . a situation in which an agency cannot comply with a request for information because it does not have the technological capability to separate exempt from non-exempt data. The legislative history of §§ 1-211 (a) and 1-212 (b) unequivocally indicates that such a request does not fall outside the scope of the act. Rather, pursuant to the act, the disclosing agency must comply with such a request either by developing a program or contracting with an outside entity to develop a program, provided that the requesting party is willing to bear

the attendant costs." (Citations omitted; emphasis in original.) Id., 93–95.

Our Supreme Court found further support for its conclusion in its "interpretation of the act in *Maher* v. *Freedom of Information Commission*, 192 Conn. 310, 472 A.2d 321 (1984). In *Maher*, the defendant newspaper, pursuant to the act, requested from the plaintiff [D]epartment of [I]ncome [M]aintenance [(agency)] certain information regarding drugs prescribed by physicians pursuant to the [M]edicaid program. . . . The commission ordered the disclosure of the information requested by the [newspaper], and the trial court affirmed the decision of the commission. . . . In [our Supreme] [C]ourt, the [agency] argued that the act did not require disclosure of the information because, although the [agency] was in possession of the information requested, a new computer program would have to be produced to enable the [agency] to comply with the [newspaper's] request. . . .

"The court in *Maher* rejected that argument as being inconsistent with the statutory predecessor of § 1-211 (a) then in effect, General Statutes [(Rev. to 1979)] § 1-19a.[7] . . . After noting that this argument was inconsistent with the broad language of that statute, the court stated: 'Where, as here, the information sought is presently stored in the agency's data base, and the cost of the new program is to be borne by the person seeking the information, an order compelling production of computer tapes is within the powers statutorily conferred upon the [commission].' " (Citations omitted; emphasis omitted; footnote in original.) *Hartford*

---

[7] "At the time of the request at issue in *Maher*, General Statutes (Rev. to 1979) § 1-19a provided: 'Any public agency which maintains its records in a computer storage system shall provide a printout of any data properly identified.' " *Hartford Courant Co.* v. *Freedom of Information Commission*, supra, 261 Conn. 95 n.7.

*Courant Co.* v. *Freedom of Information Commission,* supra, 261 Conn. 95–96.

The present case is analogous to both *Hartford Courant Co.* and *Maher.* As in those cases, the plaintiffs may be in possession of records that are responsive to Braxton's request. Although the plaintiffs are not required to utilize the precise method provided by Braxton, they must comply with her request "either by developing a program or contracting with an outside entity to develop a program, provided that [Braxton] is willing to bear the attendant costs." Id., 95. Consequently, the alleged safety concerns expressed by the department provide no basis to distinguish the present case from *Shew*, which requires that they review the requested records in order to conduct the public interest balancing test under § 1-210 (b) (1).

In short, our Supreme Court has squarely addressed an agency's obligation to review the records that it claims are exempt from disclosure because the public interest in withholding the records clearly outweighs the public interest in disclosing them. Because it is undisputed in the present case that the plaintiffs have not searched for or reviewed any responsive records, the commission properly determined that the plaintiffs failed to prove that the requested records are exempt from disclosure pursuant to § 1-210 (b) (1) on the basis of that balancing test.

As to the remedy, however, we conclude that the commission's order directing the plaintiffs to retrieve the requested records and to disclose them to Braxton "free of charge" constitutes an abuse of its discretion in two respects. First, the plaintiffs have not yet reviewed the requested records to determine whether those records are exempt from disclosure under the act. In the absence of any review of the requested records,

which are part of a sexual assault investigation, requiring the plaintiffs to disclose those records could result in the disclosure of otherwise exempt information.[8] We also note that the commission specifically found that, "prior to receiving the database commands . . . the [plaintiffs] had no knowledge of such commands, were unaware that such commands could be used to produce the [RTF file] and did not have a staff member trained to execute such commands." It was only as of the date of the initial hearing before the commission, when the plaintiffs "had information, in the form of Wezenski's affidavit . . . that a file showing additions and deletions to the report and arrest warrant application, to the extent those records had been edited, would be maintained in the database and accessible by running the database commands . . . ." Given the nature of the requested records, and in light of the plaintiff's lack of knowledge as to their existence, the commission's order requiring the plaintiffs to disclose unreviewed public records is unreasonable. Instead, the appropriate remedy in the present case is to have the plaintiffs conduct the search for the requested records and review any responsive records to determine whether any of the material is exempt from disclosure under the act. See, e.g., *Pictometry International Corp.* v. *Freedom of Information Commission*, 307 Conn. 648, 666, 59 A.3d 172 (2013) (concluding that "commission abused its discretion by ordering the [agency] to provide copies of the photographic images stripped of the associated metadata to [the complainant] without first providing the [agencies] with an opportunity to determine whether their disclosure would pose a safety risk [under § 1-210 (b) (19)]").

Second, requiring that the plaintiffs bear the cost of locating and producing the requested records when

---

[8] During oral argument before this court, counsel for the commission acknowledged that this court's concern about the disclosure of otherwise exempt information was "well taken."

Braxton, pursuant to § 1-212 (b), agreed to pay those costs, also constitutes an abuse of the commission's discretion.[9] Because the existence of the requested records was confirmed only after Braxton filed her complaint with the commission, an order that contradicts the express terms of § 1-212 (b), thereby penalizing the plaintiffs, is unwarranted.

## II

The plaintiffs contend, as an alternative ground for affirming the judgment of the trial court, that the commission improperly determined that the requested records are not exempt pursuant to § 1-210 (b) (20). We disagree.

Section 1-210 (b) (20) provides that "[n]othing in the Freedom of Information Act shall be construed to require disclosure of . . . [r]ecords of standards, procedures, processes, software and codes, not otherwise available to the public, the disclosure of which would compromise the security or integrity of an information technology system . . . ."

The commission found that, "because the requested records are not 'standards, procedures, processes, software or codes' but rather, are records that may be produced upon execution of certain database commands, it is found that such exemption is not applicable to the requested records." Likewise, the trial court concluded that § 1-210 (b) (20) did not apply because the requested records are not standards, procedures, processes, software and codes.

On appeal, the plaintiffs clarify that "[t]he argument is not that the records themselves constitute software

[9] During oral argument before this court, although Braxton argued that requiring the plaintiffs to produce the records free of charge was within the commission's authority, she acknowledged that her client remains willing to pay the costs associated with retrieving and producing the requested records if ordered to do so.

and codes. The plaintiffs' concern is that production of preliminary police reports requires possession of software and codes by the public, or person(s) requesting the documents. These software or codes would clearly reveal information about the nature and qualities of software and codes used by the [department]." According to the plaintiffs, the trial court and the commission failed to recognize that "[h]ow computers respond to [database commands] will, necessarily, reveal information about the codes and software on that computer. . . . The execution of data commands and studying what is produced, whether it be the preliminary drafts sought or error messages, will reveal information about software and codes which the plaintiffs seek to protect." We are not persuaded.

The plaintiffs failed to present any evidence before the commission to substantiate their alleged safety concern involving the inadvertent disclosure of "information about software and codes which [they] seek to protect." Indeed, neither of the plaintiffs' witnesses before the commission was qualified to testify about the ramifications of running the database commands, as Officer Chan testified that he "wouldn't even know what to do with" the database commands, and Deputy Chief Berry acknowledged that he is "not a computer expert" and that the department does "not have . . . the ability to do [that] type of . . . programming." In contrast, Wezenski, who wrote the relevant computer code, testified only that running the database commands would produce the data sought. Notably absent from Wezenski's testimony is any trepidation about running the commands or any indication that the information produced by doing so would allow Braxton, or anyone else, access to any of the department's software or codes.

Our Supreme Court's decision in *Director, Dept. of Information Technology* v. *Freedom of Information*

*Commission*, supra, 274 Conn. 195–96, is instructive. In that case, the complainant "submitted a written request to the town's board of estimate and taxation, asking for a copy of all [geographic information system (GIS)] data concerning orthophotography, arc info coverages, structured query language server databases, and all documentation created to support and define coverages for the arc info data set." Id., 182. The director of the town's department of information technology (director) denied the complainant's request, claiming that the data was exempt from disclosure pursuant to, inter alia, § 1-210 (b) (20). Id., 182–83. The complainant appealed to the commission, which found that the information was not exempt because it was not "the type of information that would pose a threat to the security of the town's information technology system within the meaning of [the statute]." Id., 183. The trial court dismissed the director's administrative appeal, concluding that the director "had failed to provide any specific evidence that would demonstrate that disclosure of the requested data would compromise the security or integrity of the town's information technology system." Id., 183–84.

The director appealed to this court, and our Supreme Court transferred the appeal to itself. Id., 184. Before our Supreme Court, the director claimed that "the trial court improperly found that the plaintiff did not meet his burden of proof that the records were exempt under § 1-210 (b) (20)." Id., 195. In rejecting that claim, our Supreme Court noted that "the [director] did not present any specific evidence to demonstrate how the disclosure of the requested GIS data would compromise the overall security of the town's information technology system. The [director] testified that he was concerned about the vulnerability of the town's network to a security breach should the network become available to the public. In support of this concern, the [director] stated that computer firewalls are not foolproof,

and that the firewalls of '[m]any high security agencies' had been breached. The [director], however, did not provide specific examples of such security breaches, or evidence that any such breaches had been caused by the disclosure of GIS data." Id., 195–96. Given that evidentiary lacunae, our Supreme Court agreed with the trial court and concluded that "the evidence presented in [that] case was insufficient to establish that the requested GIS data were exempt from public disclosure under the act." Id., 196.

Here too, the plaintiffs assert a vague safety concern based on revealing information about the way that the NexGen database operates, but they failed to present any evidence as to specific software or codes that would be revealed by disclosure of the requested records. Consequently, we cannot conclude that the plaintiffs satisfied their burden of proving that the requested records are exempt from disclosure under § 1-210 (b) (20).

The plaintiffs' position also is untenable because, as previously noted in part I of this opinion, §§ 1-211 (a) and 1-212 (b) address this precise situation. That is, when, as in the present case, "an agency cannot comply with a request for information because it does not have the technological capability," the "agency must comply with such a request either by developing a program or contracting with an outside entity to develop a program, provided that the requesting party is willing to bear the attendant costs." *Hartford Courant Co.* v. *Freedom of Information Commission*, supra, 261 Conn. 94–95. Accordingly, as provided in the act, the plaintiffs are free to develop their own method of retrieving and producing the requested records and, thus, can avoid their concerns about potential disclosures regarding their software or codes.

In sum, we conclude that the commission properly found that the plaintiffs failed to meet their burden of

proof with respect to the applicability of the exemptions set forth in §§ 1-210 (b) (1) and 1-210 (b) (20). Nonetheless, we conclude that the commission abused its discretion in ordering the plaintiffs to retrieve the requested records and provide them to Braxton "free of charge" without affording the plaintiffs an opportunity to review the records to determine whether any of the information contained therein is exempt from disclosure under the act. As a result, the matter must be remanded for further proceedings before the commission regarding Braxton's request.

The judgment is reversed and the case is remanded to the trial court with direction to remand the case to the commission for further proceedings consistent with this opinion.

In this opinion the other judges concurred.